**Judge Mark A. Goldsmith**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-20460 |
| Plaintiff, | |
| v. | **EX PARTE MEMORANDUM IN SUPPORT OF MOTION FOR SUBSTITUTION OF CJA COUNSEL** |
| D-2 CARLO WILSON, | |
| Defendants. | **(FILED UNDER SEAL)** |

I.    **EX PARTE MEMORANDUM IN SUPPORT OF MOTION FOR SUBSTITUION OF CJA COUNSEL**

On June 22, 2016, Defendant Carlo Wilson was indicted. Doc. 1. On June 29, 2016, retained counsel[1] Marc Lakin appeared for Mr. Wilson. Doc. 12. The crimes charged in the indictment carry with them the possibility of a death sentence. Doc. 1. As such, this Court, pursuant to 18 U.S.C. § 3005, appointed Jacqueline Walsh as learned counsel for Mr. Wilson.

---

[1]    A third party payor initially retained Mr. Lakin to represent Mr. Wilson in state court. Thereafter, Mr. Wilson was indicted on the above noted cause and counsel continued to represent him.

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel                    -1-

Doc. 29. Later, Mr. Lakin - who is not on the CJA panel – sought appointment at public expense because the third party payor who retained him could no longer afford his services. At that time, the Federal Public Defender Miriam Siefer supported Mr. Lakin's representation of Mr. Wilson because Mr. Lakin represented that he had known the Wilson family for some time. Thereafter, this Court appointed Mr. Lakin at public expense. On June 23, 2017, the United States Attorney's Office notified counsel for Mr. Mills and Mr. Wilson that the Department of Justice (DOJ) would like to schedule a time to meet with defense counsel about their respective clients in Washington, D.C. DOJ's request to meet with counsel underscores the seriousness of this case.

Undersigned counsel now seeks the removal of Mr. Lakin and requests that an attorney from the CJA panel be substituted as counsel for Mr. Wilson.[2] Substitution of counsel serves two purposes: 1) to ensure that Mr. Wilson has conflict free counsel and 2) to protect Mr. Wilson's right to effective assistance of counsel under the Sixth Amendment.

**A. Conflict Free Counsel**

Counsel Lakin previously represented Naysa Navae Thornton, Jr. presumably on an unrelated matter. On January 6, 2017, the government filed a complaint against Mr. Thornton in the United States District Court in the Eastern District of Michigan, Southern Division. See *United States v. Thornton*, 2:17-mj-30009, Doc.1. With regards to the Making a False Claim to a Firearms Dealer charged in the complaint, Mr. Thornton sought to retain Mr. Lakin.[3] On January

---

[2]     Learned counsel has conferred with Federal Defender Miriam Siefer and Ms. Siefer has assured counsel that should this Court remove Mr. Lakin, she will recommend quality lead counsel to be appointed to represent Mr. Wilson.

[3]     In the Thornton complaint, the Special Agent affirms that Mr. Norton purchased a Taurus Model PT 24/7, .45 caliber handgun in April of 2015 and that the handgun is suspected to be involved in murders related to racketeering activity. This was 8 months prior to the homicide in

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel                        - 2 -

14, 2017, Mr. Thornton made his initial appearance without Mr. Lakin. In Court, Mr. Thornton was informed that Mr. Lakin could not represent him because of a conflict of interest. On or about January 14, 2017, Mr. Thornton informed Mr. Lakin of the same.

Since learning of this potential conflict, the Assistant United States Attorney Brant Cook affirmed that if Mr. Lakin represented Mr. Thornton on this substantially related case, he would have a "direct conflict." *See* American Bar Association's (ABA) Rules of Professional Conduct (RPC) 1.7 (a)(1), (2)[4] and 1.9(a).[5] A copy of the complaint filed against Mr. Thornton is attached as Exhibit A.

Mr. Wilson should not have to wait until the eve of trial to lose his counsel. If Mr. Thornton cooperates with the government and is later called to testify against Mr. Wilson, removal of Mr. Lakin is necessary. RPC 1.9(a). Thus, at this juncture, the most prudent course is to substitute a CJA panel attorney experienced in complex cases in place of Mr. Lakin and ensure conflict free counsel for Mr. Wilson.

**B. Sixth Amendment Right to Effective Assistance of Counsel**

The CJA Guidelines Vol.7, chapter 6, recommend that "Courts should ensure that *all* attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior

---

which Mr. Wilson is alleged to have been involved.

[4] ABA, RPC 1.7(1)(a): Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

[5] ABA, RPC 1.9(a): (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel                    - 3 -

defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management." (Emphasis added). Federal law requires the appointment of two counsel to represent a defendant in a federal death penalty case, of whom at least one must be learned in the law applicable to capital cases." 18 U.S.C.§3005. Counsel also has "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Furthermore, counsel are expected to comply with the *American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L.Rev.913 (2003) and the *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (2008).

Lead counsel Marc Lakin is not qualified pursuant to 18 U.S.C. §3005. This Court appointed counsel "learned in the law applicable to capital cases" for Mr. Wilson satisfying 18 U.S.C. §3005, however, this appointment alone does not satisfy the recommendations of CJA Guidelines Vol.7, chapter 6, where courts are encouraged to ensure that all attorneys appointed to represent capitally eligible defendants are well qualified.  As set forth below, Mr. Lakin's words and inaction during the course of his representation of Mr. Wilson do not support that he is well qualified to represent Mr. Wilson in this highly specialized and demanding type of litigation.

### 1.  **Standard of Care**

In any capital case, counsel has a duty to conduct a thorough mitigation investigation. *Williams v. Taylor*, 529 U.S. 362, 396 (2000)(ineffective assistance where capital counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background").

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel                         - 4 -

Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case and has been acknowledge by courts for nearly 40 years. *Lockett v. Ohio*, 438 U.S. 586 (1978). As noted in the Commentary to the ABA Guidelines: "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relations, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense." *American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L.Rev.913 (2003). The Supplementary ABA Guidelines further note:

> Because the mitigation function is of utmost importance in the defense of capital cases, and because counsel must rely on the assistance of experts, investigators and mitigation specialists in developing mitigating evidence, these supplementary interdisciplinary performance standards are necessary to ensure that all members of the defense team perform in accordance with prevailing national norms when representing a client who may be facing execution.

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (2008). Mr. Lakin has not availed himself of the experience or knowledge of the other team members nor has he engaged in the prevailing national norms when representing a client on a potential capital case.

### 2. Breakdown of Team

The unique complexity of capital litigation requires that: teams develop tools to manage the flow of information in an effective manner; teams ensure that the entire team continues to work as a team for the duration of the case; and, that team members stay focused on the countless tasks that must be completed during the life of the case. Despite implementing tools to manage this case and work on the case as a team, Mr. Lakin has not contributed to the necessary work that must be done.

Unfortunately, Mr. Lakin's conduct impedes the progress of this team. For example: he

has missed countless telephonic team meetings, as well as an in person meeting scheduled in Detroit; he has failed to communicate with any others on the team about his meetings with the client; he has not shared information with our fact investigator; he has tried to undermine the trust that team members are building with the client and the family by complaining to the client and his family about co-counsel and others on the team; he has failed to appear for meetings with the client; he has sent inappropriate late night text messages to Mr. Wilson's mother; and, after assuring the team that he has reviewed all the discovery, as recently as May 15, 2017, asked the team paralegal how to find bate stamp number one of the discovery provided by the government. Many hours have been spent trying to educate Mr. Larkin on basic litigation tools to no avail.

### 3. Inappropriate Remarks

On January 5, 2017, after a court hearing was cancelled, both counsel met to discuss the case. Mr. Lakin informed the undersigned that he does not go to "those neighborhoods" to see "those people" when referring to Mr. Wilson's African American family members and the neighborhood in which they reside. Mr. Lakin advised that he had a lot of life insurance policies that prohibited him from going to "those neighborhoods." Not only are the remarks offensive and racially biased and insensitive, counsel afraid to visit the client's family cannot begin to understand the course of the client's life history. As noted by retired Alabama Judge William M. Bowen, Jr.:

> The Supplementary [Mitigation] Guidelines provide that the defense team must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures.

*A Former Alabama Appellate Judge's Perspective on the Mitigation Function in Capital Cases*, 36 Hofstra L. Rev. 805, 813 (2008) (internal quotes omitted).

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel       - 6 -

Being mindful of client confidences, undersigned counsel has not set forth specifics for each instance of the quality of Mr. Lakin's representation. Undersigned counsel is available to answer any questions from the Court, however.

Mr. Lakin had not previously returned calls, nor joined team discussions so that this issue could be discussed with him. However, on June 30, 2017, he finally joined a team call. Undersigned informed Mr. Lakin of her intent to file this motion and asked whether he opposed it. Mr. Lakin informed the team that he would be filing a similar motion for the removal of learned counsel.

**C. Conclusion**

For the reasons set forth above, undersigned counsel respectfully requests that this Court substitute quality lead counsel from the CJA panel for Mr. Lakin so that Mr. Wilson has conflict free counsel and effective representation.

Respectfully submitted this 6th day of July, 2017.

Walsh & Larrañaga
705 2nd Ave. Suite 501
Seattle, WA 98104
206-325-7900x5
jackie@jamlegal.com

/s/Jacqueline K. Walsh
Jacqueline K. Walsh
Washington State Bar #21651
Attorney for Carlo Wilson

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel                          - 7 -

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed ex parte and under seal via the Court's ECF system and sent to co-counsel Marc Lakin's e-mail address on July 6th, 2017.


/s/ Jacqueline K. Walsh
Jacqueline K. Walsh

Ex Parte Memorandum in
Support of Motion for
Substitution of Counsel                     - 8 -

# Exhibit A

AUSA: A. Brant Cook                                    Telephone: (313) 226-9756

Special Agent          : Mark A. Jackson, ATF          Telephone: (313) 202-3640

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
## Eastern District of Michigan

$5$

United States of America,

Plaintiff,

v.

Naysa Navae THORNTON, Jr.

Case: 2:17-mj-30009
Assigned To : Unassigned
Assign. Date : 1/6/2017
Description: CMP USA v. SEALED MATTER (SO)

Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of __April 2016__, in the county of __Oakland__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(6) | Making False Statements to a Firearms Dealer. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☐ Continued on the attached sheet.

_____
Complainant's signature

Mark A. Jackson, Special Agent, ATF
Printed name and title

Sworn to before me and signed in my presence.

Date: __January 6, 2017__

_____
Judge's signature

City and state: __Detroit, Michigan__

Mona K. Majzoub, United States Magistrate Judge
Printed name and title

# AFFIDAVIT

Mark A. Jackson, being sworn, deposes and states the following:

1. I make this affidavit from personal knowledge based on my participation in this investigation, including witness interviews by myself and/or other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware of relating to this investigation.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives in Detroit, Michigan, and have been so employed since May 2000. Prior to this, I was employed as a Senior Inspector with the United States Customs Service in Detroit, Michigan for approximately three and one-half years. Along with other training I have received, I am a certified law enforcement instructor and regularly teach firearms trafficking courses to ATF and other agencies. I have participated in hundreds of investigations involving violations of federal firearms and narcotics laws, resulting in the arrest and convictions of numerous criminal defendants and the seizure of large quantities of firearms.

3. I am investigating the alleged lying to obtain firearms of Naysa Navae THORNTON Jr., B/M, DOB XX/XX/1991 of Detroit, Michigan.

4. Special Agents with the Federal Bureau of Investigation have been involved in investigating murders committed on the east side of Detroit on December 1, 2015, relating to racketeering activity.

5. On April 27, 2016 during the course of the FBI's murder investigation, law enforcement recovered a firearm, a Taurus model PT24/7, .45 caliber handgun bearing serial number NHM80932, suspected to be used in murders relating to racketeering activity. Later forensic testing showed that the firearm has fired shell casings recovered at the scene of the murders.

6. A trace of this firearm through the Bureau of Alcohol, Tobacco, Firearms and Explosives' National Tracing Center revealed that this firearm was

purchased by Naysa Navae THORNTON Jr., black male, DOB XX/XX/1991. The firearm was purchased by THORNTON on April 24, 2015 from Action Impact, a Federal Firearms Licensee, on 8 Mile Rd. in Southfield, Michigan. THORNTON is not a suspect in committing the murders related to the firearm.

7. Further investigation revealed that THORNTON had purchased at least seven other firearms between December 2014 and April 2016.

8. The FBI obtained copies of the Michigan State Police Pistol Sales Records (Michigan State Police Form RI-060) for each of the eight handguns that THORNTON purchased. For purchases on February 18, 2016; March 23, 2016; April 6, 2016; and April 7, 2016 THORNTON listed his telephone number as 313-699-5873.

9. During the course of its murder investigation, the FBI recovered a cell phone from a suspect in the murders. During a search of that cellphone, the FBI queried for the phone number 313-699-5873, used by THORNTON. Within the cell phone recovered from the murder suspect, there are 67 calls and texts between the murder suspect's phone and 313-699-5873 between April 9, 2016 and April 20, 2016. In these text messages, THORNTON talks about a "Draco" with a "30 rd clip and 75rd drum" and asks for $1000 for the firearm. In other text messages, THORNTON states, "…I got the choppa and the ar wit me". Choppa is street slang for an AK-type rifle and "ar" is referring to an AR-15 type rifle. There are further messages to and from THORNTON referring to the purchase of a "k" from THORNTON, believed in this instance to mean an AK-type rifle, and multiple references to the "drac" and "drake", referring to the Century Arms Draco. On April 20, 2016 there are text messages showing THORNTON asking for the "drake" back.

10. A review of firearms purchases by THORNTON reveal that THORNTON purchased a Century Arms Draco from Action Impact on April 7, 2016 and provided 313-699-5873 as the "Purchaser's Telephone Number" on the Michigan State Police Pistol Sales Record.

11. In September 2016, Special Agents with the Federal Bureau of Investigation interviewed THORNTON in regards to his firearms purchases. THORNTON stated that he used to live with his grandparents on Birwood in Detroit but is currently living in Farmington Hills with his

girlfriend. THORNTON provided agents with copies of the Pistol Sales Records (Michigan State Police Form RI-060) for eight firearms. THORNTON told agents that all of the firearms, with the exception of one Glock, had been stolen. THORNTON could not recall the date of the theft but claimed that the firearms were stored in the garage of his grandparent's house and one day noticed that all of the firearms were gone. THORNTON also told agents that he did not report his firearms stolen, and could not recall an approximate month, season, or year when he noticed the firearms were missing. THORNTON did specify that one of the firearms was a Draco with a 75 round drum magazine, and stated that another was an AR-style rifle with a scope and a laser.

12. THORNTON completed an ATF Form 4473 when he purchased each of the above-mentioned firearms and I obtained copies of each of these forms. The forms signed by THORNTON contained the following warning to the buyer: **"Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you."** On each form, THORNTON stated that he was the "actual buyer" of the firearms.

13. On October 14, 2016 I queried LEIN (Law Enforcement Information Network) for firearms registered to THORNTON in the State of Michigan, as required by Michigan State law. THORNTON registered one Smith & Wesson handgun in 2014, and two Taurus handguns in 2015. THORNTON has no other handguns registered.

14. I checked with Industry Operations Investigator Sandi Lecznar who confirmed that Naysa THORNTON does not and never has held a Federal Firearms License.

15. THORNTON has shown that he is aware of the State of Michigan's firearms registration requirement due to the registration of the first three firearms he purchased, however, THORNTON failed to register any of the five firearms he purchased after that. Based on my training and experience, this is a strong indication of potential firearms trafficking, or obtaining firearms for another person. THORNTON is not registering these firearms in an attempt to minimize the paper trail and evade law enforcement when the firearms are recovered in crimes.

2:17-mj-30009-DUTY Doc # 1 Filed 01/06/17 Pg 5 of 5 Pg ID 5

16. I also know, based on my training, experience and past firearms trafficking investigations, that individuals who purchase multiples of inexpensive handguns, particularly in a short period of time, and do not register the firearms with the State of Michigan are often diverting the firearms into the illegal marketplace. I know from my training and experience, having traced hundreds of firearms and my daily interaction with firearms and the firearms industry that a great majority of firearms purchased by THORNTON fit into this illegal diversion category. In this case, THORNTON has purchased eight handguns, many of them being of the same or similar make and model, in a relatively short period. None of these firearms have any collector value.

17. Based on the foregoing, I have probable cause to believe that Naysa Navae THORNTON Jr. did knowingly make false statements to a firearms dealer in violation of Title 18 U.S.C., Section 922(a)(6).

Mark A. Jackson
Special Agent

Sworn to before me and signed in my presence
on this 6th day of January 2017.

Honorable Mona K. Majzoub
United States Magistrate Judge