# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,    )

    )

        Plaintiff,    )

    )    CRIMINAL NO. 2:16-CR-20460

    vs.    )

    )    HON. MARK A. GOLDSMITH

    )

D-2   CARLO WILSON,    )

    )

        Defendants.    )


## GOVERNMENT RESPONSE TO MOTION
## FOR PRE-TRIAL *ATKINS* DETERMINATION (ECF No. 930)

COMES NOW the United States of America, by and through its attorneys, Matthew Schneider, United States Attorney and Louis A. Crisostomo, Robert Moran, and Andrew Picek Assistant United States Attorneys, and James Peterson, Department of Justice trial attorney and submits this response to defendant WILSON's Motion for a Pretrial Determination that Bars the Government from Seeking the Death Penalty Against Him Because He is a Person with Intellectual Disability. [ECF No. 930].

The government agrees to the procedure by which the Court makes the intellectual disability determination pre-trial. The government notes that the defendant bears the burden of proving the he suffers from intellectual disability by

a preponderance of the evidence.  The government further agrees that the current

medical diagnostic standards set forth in the American Association on Intellectual

and Developmental Disabilities; Intellectual Disability: Definition, Classification,

and Systems of Support (11th ed. 2010) (AAIDD) as well as the American

Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (5th

ed., 2013) (DSM-5) provides the framework for the Court's determination.  *See*

*Moore v. Texas*, 137 S. Ct. 1039 (2017).

WILSON cannot meet the burden of proving by a preponderance of the

evidence that he suffers from intellectual disability.  There exist no records to

establish that WILSON was ever diagnosed or suspected to be intellectually

disabled prior to committing the murder that brings him before the Court.

Contemporaneous records and conduct demonstrate intellectual functioning and

adaptive behavior inconsistent with intellectual disability.  WILSON's interaction

with law-enforcement demonstrates intellectual functioning and adaptive behavior

inconsistent with intellectual disability.  His ability to achieve and maintain a

driver's license is inconsistent with intellectual disability.  WILSON's use of social

media and technology is inconsistent with intellectual disability.

## BRIEF IN SUPORT

### I.     Procedural and Historical Intellectual Disability Background

On June 22, 2016, a federal grand jury returned the Indictment in this matter,

charging two defendants, EDWIN MILLS and CARLO WILSON, with multiple

counts of Murder in Aid of Racketeering, Assault with a Dangerous Weapon in

Aid of Racketeering, and related firearms charges. ECF No. 1.  The homicide

related charges are death penalty eligible offenses.  On February 28, 2018, a

federal grand jury returned the Second Superseding Indictment. ECF No. 292.  On

March 1, 2018, the government filed its Notice of Intent to Seek the Death Penalty

against E. MILLS and WILSON.  ECF No. 293.  On March 15, 2019, defendant

WILSON gave notice that he claims to be intellectually disabled pursuant to the

Supreme Court's decisions in *Atkins v. Virginia*, 536 U.S. 304 (2002); *Hall v.

Florida*, 134 S.Ct. 1986 (2014); *Brumfield v. Cain*, 135 S.Ct. 2269 (2015); and

*Moore v. Texas*, 137 S. Ct. 1039 (2017).  ECF No. 814.[1]

---

[1] Wilson has taken strong opposition to the government's use of the term MR, in
conjunction with the term intellectual disability, in its prior pleadings.  The
government never intended to use offensive language.  Rather, the government
notes that the case upon which the defendant's claim is based, *Atkins v. Virginia*,
536 U.S. 304 (2002) uses that term and that the FDPA prohibition found in 18
U.S.C. § 3596 (c) currently uses the term MR and does not use the term intellectual
disability.  Moreover, much of the literature relied upon by the defense and
government, as well as informative or controlling case law, uses the term MR.
Unless quoting or referring to a diagnosis, the government will use the term
"intellectual disability" rather than the term that was used at the time of the *Atkins*
decision.  *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

The government has retained Dr. Robert Denney, Dr. Joel Morgan, and Dr. Geoffrey Aguirre to assess and examine the evidence of intellectual disability proffered by WILSON so far. Dr. Denney's report is attached as Exhibit A. His CV has previously been filed. Dr. Morgan's report is attached as Exhibit B. His CV is attached as Exhibit C. Dr. Aguirre's report is attached as Exhibit D. His CV is attached as Exhibit E. Scott D. Mierendorf is a Forensic Examiner for the FBI. He is a Computer Analysis Response Team (CART) member for the FBI. He extracted the social media, and other, information from WILSON's phone. Mr. Mierendorf has not prepared a report for the *Atkins* hearing, but his reports of the analysis of WILSON's cell phone have previously been provided to WILSON and the government intends to rely upon those reports. His CV is attached as Exhibit F.

Years before the United States Supreme Court issued its ruling in *Atkins v. Virginia*, the federal government recognized and advocated that the death penalty should not be applied to those who are intellectually disabled. Title 18 U.S.C. § 3596 provides "a sentence of death shall not be carried out upon a person who is mentally retarded . . . [or] upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed upon that person." Subsequent to Congress' enactment of Section 3596, the Supreme Court declared the execution of an intellectually disabled person to be cruel and

unusual punishment under the Constitution. *Atkins v. Virginia*, 536 U.S. 304 (2002).  In *Atkins*, the Supreme Court concluded that the standards of decency have so evolved that there is now a national consensus against executing intellectually disabled offenders.

The Court in *Atkins* recognized the difficulty of making an intellectual disability determination in the context of a death penalty case.  In announcing its ruling, the Court made clear that:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, with regard to insanity, "we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences."

*Atkins*, 536 U.S. at 317, *see also United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL 1516147 *2  (W.D. Tenn. Jan. 28, 2014).

Daryl Renard Atkins's subsequent journey through the criminal justice system aptly shows how difficult, and contentious, claims of intellectual disability can be in the context of death penalty cases.  On remand, the Supreme Court of Virginia considered whether "the Supreme Court decided that Atkins is, in fact, mentally retarded, thus requiring this Court to commute his sentence of death to life imprisonment."  *Atkins v. Commonwealth*, 266, Va. 73, 76 (2003).  The Court

concluded that "the Supreme Court did not make that determination, nor has the

question of Atkins' mental retardation been answered at any point in his case." *Id*.

In making that determination, the Supreme Court of Virginia stated:

> In *Atkins II*, after summarizing the testimony of the two forensic clinical
> psychologists who testified at the re-sentencing hearing, we stated that the
> jury "heard extensive, but conflicting, testimony from [the psychologists]
> regarding Atkins' mental retardation." 260 Va. at 388, 534 S.E.2d at 320.
> Continuing, we held that "the question of Atkins' mental retardation is a
> factual one, and as such, it is the function of the factfinder, not this Court, to
> determine the weight that should be accorded to expert testimony on that
> issue." *Id*.

*Id*. The Supreme Court of Virginia remanded the case back to the trial court for an

evidentiary hearing to resolve the factual issue of whether Daryl Renard Atkins

was intellectually disabled.

In the summer of 2005 a Virginia jury conducted a new penalty phase trial to

consider the question of whether Daryl Renard Atkins was intellectually disabled.

On August 5, 2005, a jury unanimously determined that Atkins was not

intellectually disabled. *See* The Washington Post, *Virginia Killer Isn't Retarded,*

*Jury Says, Execution Set*, August 6, 2005; *Atkins v. Commonwealth*, 272 Va. 144,

147 (2006). In reviewing the subsequent appeal, the Supreme Court of Virginia

noted:

> Whether Atkins is mentally retarded was a factual issue for the jury to
> determine. The Commonwealth presented testimony from Dr. Samenow
> and one other forensic clinical psychologist, both of whom opined that
> Atkins is not mentally retarded. In contrast, two clinical psychologists
> testified on behalf of Atkins and opined that he does meet the statutory

requirements for mental retardation. This evidence presented the jury with the classic "battle of the experts." It was therefore the jury's task to resolve the conflicts in the expert testimony and to decide which expert or experts were worthy of belief.

*Atkins v. Commonwealth*, 272 Va. At 154. The Supreme Court of Virginia ultimately ruled that the "fact that the jury knew a prior jury had sentenced Atkins to death prejudiced his right to a fair trial on the issue of his mental retardation" and remanded for yet another hearing on the issue of whether Daryl Renard Atkins was intellectually disabled. *Id.*, at 158.

A good reflection, perhaps, of the Supreme Court's observation that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded" is the ubiquitous *Atkins* claims filed in the past ten years in FDPA cases alone. *See United States v. Webster*, 2:12-cv-00086-WTL-MJD (S.D. Ind. 2019, Jun. 18, 2019), ECF. No. 198 (jury previously found no ID, habeas *Atkins* decision finding ID); *United States v. Roland*, 281 F. Supp. 3d 470 (D. N.J. 2017) (finding ID); *United States v. Jones*, 2017 WL 4231511 (W.D. MO) (rejecting ID claim); *United States v. Wilson*, 170 F. Supp. 3d 347 (E.D. N.Y. 2016) (finding ID after previously rejecting *Atkins* claim); *United States v. Montgomery*, 2014 WL 1516147 (W.D. TN) (rejecting *Atkins* claim); *United States v. Williams*, 1 F. Supp. 3d 1124 (D. Haw. 2014) (rejecting *Atkins* claim); *United States v. Northington*, No. 07-550-05 (E.D. PA, Feb. 5, 2013) ECF. No. 1042 (*Atkins* claim denied); *United*

*States v. Jiminez-Bencevi*, 934 F. Supp. 2d 360 (D. P.R. 2013) (*Atkins* claim denied); *United States v. Candelario-Santana*, 916 F. Supp. 2d 191 (D. P.R. 2013) (*Atkins* claim denied); *United States v. Salad*, 959 F. Supp. 2d 865, 878 (E.D. Va. 2013) (denying *Atkins* claim); *Ortiz v. United States*, No. 4:04-cv-08001-GAF (W.D. MO, Sept. 3, 2013) ECF No. 141 (*Atkins* claim denied in habeas proceeding); *United States v. Bourgeois*, No. C-02-CR-216, (S.D. TX, May 19, 2011) ECF No. 660 (*Atkins* claim denied post-conviction); *United States v. Smith*, 790 F. Supp. 2d 482 (E.D. LA 2011) (*Atkins* claim upheld); *United States v. Umana*, No 3:08-cr-00134-RJC-DSC (W.D. N.C., Mar. 19, 2010) ECF No. 934 (*Atkins* claim denied); *United States v. Lewis*, No.: 1:08 CR 404 (N.D. Ohio, Dec. 23, 2010) ECF No. 251 (*Atkins* claim upheld); *United States v. Shields*, No. 04-20254 (W.D. Tenn., May 11, 2009) ECF No. 557 (*Atkins* claim upheld); *United States v. Davis*, No. RWT-07-0199 (D. MD, Apr. 24, 2009) ECF No. 515 (*Atkins* claim upheld).

The prevalence of intellectual disability is very low in the population at large. According to the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed., 2013) (DSM-5), the prevalence rate in the overall population is approximately 1%. *See* DSM-5, pg. 38. The number of individuals falling with the range of the moderately intellectually

disabled (the range identified by WILSON's purported FSIQ of 46) is much smaller.

## II.   **Factual Background**

WILSON attended the Detroit Public School (DPS) system from at least 2001 through 2010.  As WILSON acknowledges, he attended Brewer Elementary School for grades 1 through 6.  ECF No. 930-2, pg. 19.  He attended Blackwell Institute for grades 6 though 8 and Denby High School for grades 9 and 10.  *Id*. WILSON attended grade 11 at Lincoln High School.  According to school records produced, WILSON was never held back a grade.  Despite the fact that a class existed for students with cognitive impairments, WILSON was never assigned to the class.  See ECF No. 930-2, pg. 19.  During that period, he was never determined to be intellectually disabled and there exist no records produced to support a claim that he was assigned to Special Education classes.  WILSON does claim that he received special education services consisting of two one hour classes a week.  The records do not support or suggest that he was assigned any special education services in elementary school or high school.  The Detroit Public School (DPS) System has a vibrant mechanism in place to identify and help students with special education needs and intellectual disability.  According to DPS statistics available online, almost 12,000 students were assigned to Special Education Classes.  Of those, almost 20% were assigned for cognitive impairments:

**Counts**

| Student Counts | State | Wayne RESA (82) | Detroit Public Schools Community District (82015) |
|---|---|---|---|
| Total Head Count | 1,636,786 | 309,037 | 70,418 |
| Special Ed Count | 217,911 (13.3%) | 40,937 (13.3%) | 11,957 (17.0%) |

**Entity Breakdown**

| Entity | Total Special Ed Count | Cognitive Impairment | Cognitive Impairment% |
|---|---|---|---|
| Statewide | 217,911 | 21,501 | 9.9% |
| Wayne RESA | 40,937 | 4,981 | 12.2% |
| Detroit Public Schools Community District | 11,957 | 2,341 | 19.6% |

https://www.mischooldata.org/SpecialEducationEarlyOn2/DataPortraits/DataPortraitsDisability.aspx.  Yet no records suggest that WILSON was one of those students.

WILSON's school records are inconsistent with a claim of intellectual disability.  For example, in 2010, WILSON attended Denby High School and received quarterly grades in Algebra and English 11 of a C-.

Progress Report Card: WILSON, CARLO DEJUAN
**QUARTER 1 PROGRESS REPORT**
September 7, 2010 - October 6, 2010
Grade 11

WILSON, CARLO

| Period | Course | Teacher | Q1 | ABS | TDY |
|---|---|---|---|---|---|
| A1(A) | Algebra 1A | Nguyen, Melissa | C- | 8 | 5 |
| A2(A) | ENG 11A | Ferrington, Leslie | C- | 2 | 0 |
| A3(A) | World History II | Scheel, James | F | 8 | 1 |
| A4(A) | Physical Science | Jacob, Shannon | D | 6 | 2 |

*See*, School Records of Carlo Wilson, Mit 000139.

In addition, at the time WILSON left school in the 11th grade, he was in

approximately the bottom 12% of his class.



*See* school records of Carlo Wilson, MIT .000236.   While that rank is concededly

low, it is not so low as to implicate issues of intellectual disability.  In addition,

WILSON apparently applied for, and was granted access to use the internet and

computer system at school when he was 16.



*See* School Records of Carlo Wilson, MIT .000250.

On or about February 14, 2012, WILSON started the process of obtaining a State of Michigan Driver's License.  Based upon Secretary of State Motor Vehicle (SOS) records, WILSON obtained a permit, after taking a written test, on or about February 14, 2012.  Based upon his Driver Skills Test Certificate, WILSON took and passed his road skills test on August 12, 2013.  Thereafter, he regularly and consistently renewed and maintained his driver's license.



WILSON also registered his car in his name with the SOS.  WILSON's ability to obtain a driver's license and register his car in his name, and all that entails, is inconsistent with intellectual disability.

WILSON also registered with the State of Michigan Department of Licensing and Regulatory Affairs for a Michigan Medical Marijuana Card.  He held a valid Patient registry ID card for the possession of medical marijuana in 2015 through 2016.  Presumably, WILSON applied and fulfilled all of the requirements to obtain a MMMP card.  In at least one of his self-recorded videos

documenting his encounters with law-enforcement, WILSON can be heard

informing law-enforcement officers that he possesses a MMMP card and that his

marijuana is being kept in the truck of his car, apparently in compliance with

Michigan law.  Such conduct, the government maintains, is inconsistent with

adaptive behavior deficits in one or more of the three domains identified in the

DSM-5.

On or about December 1, 2015, WILSON (and MILLS) murdered A.T. and

S.H. in front of the Troester Market.  The murder was a well-coordinated attack

using cell phones.  The murder of S.H. was planned in advance and was in

retaliation for the killing of Slick V, an enterprise member.  Members of 6 Mile

had been looking for S.H. prior to and on the day of the Troester Market shooting

as retaliation for Slick V's killing.



The level of planning, and WILSON's participation shows that his involvement in

this criminal activity was not "unintentional criminal activity" within the meaning

of the DSM-5's description of intellectual disability.

WILSON's multiple interactions with law-enforcement are inconsistent with his claim of intellectual disability.  On June 29, 2016 agents executed a federal search warrant at WILSON's residence.  Seized in the execution of the search warrant were six cell phones belonging to WILSON.  WILSON's cell phones contained many photos and videos.  On at least one of the phones, a government Computer Analysis Response Team (CART) team analyst recovered a number of videos WILSON took to memorialize some encounters he had with law enforcement.

  

In his recordings of his encounters, WILSON can be heard discussing his rights, negotiating with law-enforcement officers, and acting in a manner inconsistent with an individual with intellectual disability.   As Dr. Denney points out:

> He demonstrated quick mental processing speed and reaction times. He was able to multitask, driving, reading the ticket, and talking on the phone. Results did not suggest substantially below average intellectual functioning.

Denney Report, Exhibit A, pg. 15.  As Dr. Morgan observes:

> Most significant is the fact that an IQ of 46 would mean that Mr. Wilson has such global, profound deficits of cognitive ability, and most probably

impairments of sensory and motor skills – which he does not have – that he would be unable to function independently.

Morgan Report, Exhibit B, pg. 8.

When WILSON was arrested for his involvement in the murder, he was interviewed by the DPD and the FBI Violent Gang Task Force.  His interaction with law-enforcement on June 29, 2016 is inconsistent with intellectual disability.

 

In the interview, WILSON is seen reading the rights waiver form and tells law-enforcement that he knows what it means.  The interrogation begins with Officer Williams asking WILSON if he can read and write, to which WILSON nods his head up and down.   When asked the highest level in school he completed, WILSON responds that he attended through the eleventh grade.  Officer Williams then placed an advice-of-rights waiver form in front of WILSON, and asked Wilson to read the form to himself, which he did aloud.  Once he finished reading the form, WILSON stated, "Umm, like, I would rather have my attorney here." The give-and take between WILSON and law-enforcement during the interview is inconsistent with deficits in the three domains: conceptual, social, and practical.

Cell phones, with copious contacts on social media, was seized from WILSON.  His use of Facebook, Instagram, and other social media as well as his use of cutting edge technology is inconsistent with a claim of intellectual disability. *See United States v. Jimenez-Bencevi,* 934 F. Supp. 2d 360 (D.P.R. 2013).  For example, on or about May 17, 2008, WILSON registered a Face book account using the first name of "SixMile," last name of "Los," vanity name of "sixmile.los," and the email addresses of [carlowilson67@yahoo.com](mailto:carlowilson67@yahoo.com) and [sixmile.los@facebook.com](mailto:sixmile.los@facebook.com).  He was 14 years old at the time.  On or about August 17, 2014, WILSON uploaded to Facebook a photograph of Lomnil Jackson and Patrick Johnson, with a graphic that stated, ".B.R.O.S.FOR.LIFE.," and with a title that stated, "BROS FOR LIFE ! ! ! ! #CheddaGroveBoys."

### III.  Law and Argument

The Government agrees with the holding in *Atkins v. Virginia*, 536 U.S. 304 (2002) and again points out that the FDPA made the same exclusion eight years before the ruling in *Atkins v. Virginia*.  Neither the FDPA nor *Atkins* provides procedural or substantive rules for determining who qualifies as having intellectual disability.  *Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL 1516147 *3.  In *Atkins*, the Supreme Court referenced the clinical definitions of intellectual disability by the American Association on  Mental Retardation'  ("AAMR," now

the American Association on Intellectual and Developmental Disabilities, or "AAIDD") Manual and DSM-IV (now DSM-5)).  *Id.*

The clinical literature informs, but does not bind, the Court. *See Wilson*, 922 F.Supp.2d at 339; *United States v.  Bourgeois*, No. C-02-CR-216, 2011  WL 1930684,  at *23-24 (S.D.Tex. May 19, 2011).  *Atkins* did not delegate "to the scientific community the finding of whether an individual is mentally retarded." *Ortiz v. United  States*, 664 F.3d 1151, 1168 (8th  Cir. 2011).  Rather, *Atkins* permits "courts to exercise their own judgments as to the definition of mental retardation, even if those judgments diverged from those of leading psychologists." *Wilson*, 922 F.Supp.2d at 339.  The Supreme Court, endorsed this approach when it held that "States have some flexibility, but not 'unfettered discretion,' in enforcing *Atkins'* holdings."  *Moore*, 137 S. Ct. at 1053 *citing Hall v. Florida*, 134 S. Ct. 1986, 1998 (2014).  Thus, it is incumbent upon the Court to examine the relevant clinical definitions and come to a conclusion as to which of the dueling experts in this case has the more persuasive position based upon the proven facts.

The parties agree the defendant bears the burden to prove intellectual disability by a preponderance of the evidence.  *See United States v. Wilson*, 922 F. Supp. 2d 334, 342 (E.D. N.Y. 2013); *United States v. Williams,* 1 F.  Supp. 3d 1124, 1134-35 (D.  Haw. 2014); *United States v. Davis*, 611 F. Supp.2d 472, 474

(D. Md. 2009) (court assigning the burden on defendant to show intellectual

disability by a preponderance of the evidence).

The parties further agree that courts evaluating a defendant's *Atkins* claim

have relied upon the clinical definitions of intellectual disability promulgated by

the AAIDD Manual and the DSM-5. *See Moore v. Texas*, 137 S. Ct. 1039, 1045

(2017) (relying on AAIDD-11 and DSM-5).

As the Supreme Court has explained,

> the generally accepted, uncontroversial intellectual-disability diagnostic
> definition . . . identifies three core elements: (1) intellectual-functioning
> deficits (indicated by an IQ score approximately two standard deviations
> below the mean— i.e., a score of roughly 70—adjusted for the standard error
> of measurement); (2) adaptive deficits (the inability to learn basic skills and
> adjust behavior to changing circumstances); and (3) the onset of these
> deficits while still a minor.

*Moore*, 137 S. Ct. at 1045. Each of these three prongs must be met for a person to

be intellectually disabled.

The APA defines intellectual disability as "a disorder with onset during the

developmental period that includes both intellectual and adaptive functioning

deficits in conceptual, social, and practical domains." DSM-5 at 33. According to

the DSM-5, the following three criteria must be met before an individual may

receive a diagnosis of intellectual disability:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility.  Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

*Id.*

Although in *Atkins*, the Supreme Court struck down the execution of intellectually disabled individuals, in so doing it recognized that "not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317.  As noted above, the Court left it to the states to determine how it differentiates those "offenders about whom there is a national consensus."  Based on the Supreme Court's adoption of definitions of intellectual disability provided by the AAIDD and the APA, courts have used these definitions to determine what a defendant must prove in order to claim intellectual disability. *Atkins*, 536 U.S. at 309, n.3; *see United States v. Davis*, 611 F. Supp.2d 472, 474 (D. Md. 2009); *United States v. Hardy*, 2008 U.S. Dist. LEXIS 29996, 2008 WL 1743490 (E.D. La. Apr. 10, 2008); *United States v. Nelson*, 419 F. Supp.2d 891 (E.D. La. 2006);

*United States v. Sablan*, 461 F. Supp.2d 1239 (D. Colo. 2006).  The most recent

AAIDD definition of intellectual disability requires a showing of both intellectual

functioning deficits (an IQ score that is approximately two standard deviations

below the mean) and adaptive behavior deficits (performance on a standardized

measure of adaptive behavior that is normed on the general population that is

approximately two standard deviations below the mean in the areas of conceptual,

social, and practical skills) as well as onset of the intellectual disability before the

age of 18. AAIDD 27.  The American Psychiatric Association defines intellectual

disability as:

> The essential features of intellectual disability (intellectual
> development disorder) are deficits in general mental abilities
> (Criterion A) and impairment in everyday adaptive functioning, in
> comparison to an individual's age-, gender-, and socio-culturally
> matched peers (Criterion B).  Onset is during the developmental
> period (Criterion C).  The diagnosis of intellectual disability is based
> on both clinical assessment and standardize testing of intellectual and
> adaptive functions.

DSM-5, pg. 37.

A significant limitation in adaptive behavior generally "requires

performance of at least two standard deviations below the mean of either (a) one of

the following three types of adaptive skills; conceptual, social, and practical, or (b)

an overall score on a standardized measure of conceptual, social, and practical

skills. *Davis*, 661 F. Supp.2d at 475. Finally, people with intellectual disability do

not acquire skills during the developmental stages (i.e., years birth to approximately 18) at the same rate as individuals without a developmental disability. This is an important factor because an individual who exhibits sub-average intellectual functioning and adaptive deficits as an adult due to trauma would not be classified as intellectually disabled since that condition is not developmental in nature. *Id*.  Thus, evidence of all three prongs must be presented in order for a court to classify a defendant as intellectually disabled.

The Government notes and recognizes the Supreme Court's increased reliance and support for the DSM-5.  In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Court mentioned the Diagnostic and Statistical Manual of Mental Disorders just once.  Twelve years later, in *Hall v. Florida*, 134 S. Ct. 1986 (2014), the Court cited the DSM approvingly 20 times.  Most recently, in *Moore*, the Supreme Court called the reliance upon the DSM-5 and AAIDD definitions an "uncontroversial intellectual-disability diagnostic definition."  *Moore*, 137 S. Ct. at 1045.

The Government accepts and agrees that the DSM-5 and the AAIDD will be a significant, guiding, and in fact determinative part of the *Atkins* framework in this case.  However, the Government also wants to point out that the DSM (including the DSM-5) is a consensus document based largely upon clusters of clinical symptoms, not any objective laboratory measure.  Shortly before the publication of

the DSM-5 in 2013, Thomas Insel, the Director of the National Institute of Mental

Health, wrote:

> The goal of this new manual, as with all previous editions, is to
> provide a common language for describing psychopathology. While
> DSM has been described as a "Bible" for the field, it is, at best, a
> dictionary, creating a set of labels and defining each. The strength of
> each of the editions of DSM has been "reliability" – each edition has
> ensured that clinicians use the same terms in the same ways. The
> weakness is its lack of validity. Unlike our definitions of ischemic
> heart disease, lymphoma, or AIDS, the DSM diagnoses are based on a
> consensus about clusters of clinical symptoms, not any objective
> laboratory measure. In the rest of medicine, this would be equivalent
> to creating diagnostic systems based on the nature of chest pain or the
> quality of fever. Indeed, symptom-based diagnosis, once common in
> other areas of medicine, has been largely replaced in the past half
> century as we have understood that symptoms alone rarely indicate
> the best choice of treatment.
>
> Patients with mental disorders deserve better. NIMH has launched the
> Research Domain Criteria (RDoC) project to transform diagnosis by
> incorporating genetics, imaging, cognitive science, and other levels of
> information to lay the foundation for a new classification system.

http://www.nimh.nih.gov/about/director/2013/transforming-diagnosis, last

accessed 6/26/19.

In fact, the DSM-5 itself contains a cautionary statement for the forensic use

of the DSM.  The DSM-5 provides, in part:

> However, the use of DSM-5 should be informed by an awareness of the risks
> and limitations of its use in forensic settings. When DSM-5 categories,
> criteria, and textual descriptions are employed for forensic purposes, there is
> a risk that diagnostic information will be misused or misunderstood. These
> dangers arise because of the imperfect fit between the questions of ultimate
> concern to the law and the information contained in a clinical diagnosis. ***In
> most situations, the clinical diagnosis of a DSM-5 mental disorder such as***

**intellectual disability (intellectual developmental disorder)**, schizophrenia, major neurocognitive disorder, gambling disorder, or pedophilic disorder **does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard (e.g., for competence, criminal responsibility, or disability).** For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and-disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

DSM-5.

## A.    The Lack of Early Indications of ID or Testing

The lack of any corroborative documentary, or psychological testing, during the developmental years is fatal, as a practical matter, to his *Atkins* claim under these circumstances.  Sixth Circuit case law discussing the evaluation of intellectual disability in the context of social security benefits is instructive.  The Sixth Circuit requires that the third prong (developmental years) element be satisfied with definitive evidence. "[W]e generally require a claimant to meet this requirement through more definite means, such as providing the Commissioner with scores from a test taken prior to the age of 22 or conclusions from an evaluation performed before Plaintiff had turned 22."  *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 873 (6th Cir. 2003).  Even evidence of special education classes, poor academic performance, or failure to finish high school are not, alone, sufficient to meet the prong three requirement in the context of determining social

security eligibility for intellectual disability.  *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 540 (6th Cir. 2014) ("[N]either circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two").

To be clear, the government is not stating that Sixth Circuit social security benefits precedent is binding or controlling on this Court in making an *Atkins* inquiry.  The government is not suggesting that WILSON is barred from making a claim, or proving an *Atkins* claim, simply because there is no evidence of any intellectual disability finding prior to 2018.  Rather, the clear Sixth Circuit case law points out a glaring deficiency in WILSON's proof.  He simply has no reliable evidence that his claimed intellectual functioning deficits and claimed adaptive behavior deficits manifested during the developmental years.

**B.      Criminal-Maladaptive Behavior is not Adaptive Behavior Deficits**

WILSON's criminal conduct and involvement in the 6 Mile Chedda criminal enterprise is not necessarily evidence of adaptive behavior deficits supporting a claim of intellectual disability.  The AAIDD provides:

ADAPTIVE BEHAVIOR VERSUS PROBLEM BEHAVIOR

Adaptive behavior is conceptually different from maladaptive or problem behavior, even though many adaptive behavior scales contain assessments of problem behavior, maladaptive behavior, or emotional competence (Thompson et al., 1999). Correlational relationships between domains of

adaptive and maladaptive behavior are generally low, r < 0.25, with a tendency to be higher in samples of persons with more severe forms of ID (Harrison, 1987).  There is general agreement that the presence of clinically significant levels of problem behavior found on adaptive behavior scales does not meet the criterion of significant limitations in adaptive functioning (Greenspan, 1999; Borthwick-Duffy, 2007). Therefore, behaviors that interfere with a person's daily activities, or with the activities of those around him or her, should be considered problem behavior rather than the absence of adaptive behavior.  It should also be recognized, however, that the function of inappropriate or maladaptive behavior may be to communicate an individual's needs and, in some cases, may even be considered adaptive.

AAIDD, pg. 49.

The DSM-5 also speaks to the issue in a way that makes clear that intentional-planned criminal behavior can be evidence that rebuts a claim of ID, and not evidence of adaptive behavior deficits supporting a claim of intellectual disability.   The DSM-5 provides:

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments.  Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including *Atkins*-type hearings involving the death penalty.

,
DSM-5, pg. 38.

C.      **Retrospective analyses are disfavored**

The Patton adaptive behavior analysis also suffers from another shortcoming.  It is based upon a retrospective analysis of claimed adaptive behavior deficits.  What that means is that there exists no contemporaneous assessment of WILSON's claimed adaptive behavior deficits and, instead, the evaluation depends upon the recollections of people recalling events many years prior.  This retrospective analysis is not favored.  *See United States v. Bourgeois*, NO. C-02-CR-216, 2011 WL 1930684 (S.D. TX) (Court must approach retrospective analysis with caution); *Montgomery,* 2014 WL 1516147 (W.D. TN) (questioning efficacy of retrospective adaptive behavior scales); *Ex Parte Cathey*, 451 S.W.3d 1 (Tex. 2014) (retrospective Vineland adaptive behavior analysis cannot be credited).

### D.    The Effect of WILSON's Driver's License

WILSON fails to adequately address, or discuss, the fact that he was able to complete the Michigan Driver's examination and obtain a driver's license.  The government suggests that his ability, under these circumstances, is fundamentally inconsistent with his claim that he has intellectual deficiencies, or adaptive behavior deficits, consistent with a diagnosis of intellectual disability.

Courts have refused to find a defendant intellectually disabled under *Atkins* when that defendant has obtained a driver's license.  *See Montgomery,* 2014 WL 1516147 (Defendant received his driver's license after his younger brother Adrian

Montgomery); *United States v. Candelario-Santana*, 916 F. Supp. 2d 191 (D. P.R.

2013) (When he was twenty-two years old, Candelario-Santana obtained a driver's

license, which he still has).  Conversely, courts have found an inability to obtain a

driver's license probative of intellectual disability.  *See Hill v. Anderson,* 881 F.3d

483 (6th Cir. 2018) (In addition to his significant limitations in functional

academics, self-care, social skills, and self-direction, the record also demonstrates

that Hill has never lived independently, never had a driver's license or a bank

account, never been able to perform a job without substantial guidance from

supervisors, was labeled "functionally illiterate" at school and in prison, could

never read or write above a third-grade level, and could never adequately sign his

own name); *United States v. Wilson*, 170 F. Supp. 3d 347 (E.D. N.Y.  2016) (The

record suggests that Wilson has suffered from practical adaptive deficits . . .

According to family members, he failed his driver's license test six times and never

passed).

> ### E.    *Moore v. Texas* **and the reliance upon brain scans**

The government suggests that WILSON's attempt to use the brain scan

evidence and the opinion of Dr. Erin Bigler is inappropriate in this case under these

circumstances.  The government also suggests that the reliance upon brain scans in

this case under these circumstances is contrary to the Supreme Court's decision in

*Moore v. Texas*.  In *Moore v. Texas*, the Supreme Court held that "the medical

community's current standards supply one constraint on States' leeway" in making

an *Atkins* determination.  *Moore*, 137 S. Ct. at 1053.  Absent from the DSM-5 and

the AAIDD Manual is a reliance on brain structural analysis as identified in brain

scans.  Dr. Bigler opines that WILSON's "cortical gray matter volume was

calculated at the 11th percentile, hippocampi at the 31st percentile, with overall

brain volume at the 16th percentile."  ECF No. 930-6, pg. 3.  Nowhere in that

analysis, however, is any support from the DSM-5 or the AAIDD Manual for that

analysis or any connection to intellectual disability.  There is simply no consensus

from the medical community, as required by *Moore*, to support any connection

between Dr. Bigler's interpretation of the Harper University scans and intellectual

disability.  *See* Yarnell, Westphal, and Ross,

*Scanning for Justice With Functional Magnetic Resonance Imaging, Biol.*

*Psychiatry, 2017 Aug 15; 82(4): e23–e24;* Weisberg, Keil, Goodstein, Rawson,

and Gray, *The Seductive Allure of Neuroscience Explanations*, Journal of

Cognitive Neuroscience 20(3): 470-7 (2008); Aguirre, *Neuroimaging in the*

*Courtroom: a Perspective From the Witness Stand with Geoffrey K. Aguirre*,

https://www.youtube.com/watch?v=QdI1BW6xsXE  (courtroom neuroscience has

been a pox on both houses – neuro-hucksterism), last accessed 6/20/2019.  The

government has pointed out that the DSM-5 is a consensus publication which bases

its diagnoses upon clusters of symptoms, but that is the framework the Supreme

Court has mandated and brain scans simply do not fit within that framework, at

least not under current precedent.   As Dr. Aguirre makes clear, "the ability of

these techniques to divine the presence of intellectual disability or developmental

abnormalities from subtle, seemingly normal variation in brain size is not

established." *See* Aguirre Report Exhibit D, pg. 3.

### F.    Adaptive Functioning Analysis

Adaptive functioning deficits must be directly related to intellectual

impairments and not other causes or sources.  The DSM-5 itself states:

> Criterion B is met when at least one domain of adaptive functioning –
> conceptual, social, or practical – is sufficiently impaired that ongoing
> support is needed for the person to perform adequately in one or more
> life settings at school, at work, at home, or in the community.  To
> meet diagnostic criteria for intellectual disability, the deficits in
> adaptive functioning must be *directly related* to the intellectual
> impairments described in Criterion A.

American Psychiatric Association Diagnostic and Statistical Manual of Mental

Disorders 38 (5th ed., 2013) (emphasis added).

### G.    The Experts

The government notes the unique nature of this inquiry concerning

WILSON's claim of intellectual disability.  No evidence has been produced to

show or suggest that he was ever considered to be intellectually disabled prior to

the commission of the murder that brings him before this Court.  This is uniquely a

forensic psychological issue because no medical or contemporaneous testing or

evaluation exists during the developmental years.  Rather, the only testing and adaptive behavior inquiry took place well after he was charged with murder and faces the most serious punishment contemplated by law.

The factfinder's evaluation of the experts presented on both sides is crucial to the outcome of this *Atkins'* analysis.  The Government's retained expert Dr. Robert Denney, has just performed his evaluation of WILSON and his report is attached.  Additionally, Drs. Joel Morgan and Geoffrey Aguirre have offered opinions as well on different aspects of WILSON's claims.  The Government provides this brief outline of their respective qualifications and experience, in the *Atkins'* context:

> 1.    Dr. Robert Denney.  Dr. Denney has been a licensed psychologist since 1991.  He is board certified in forensic psychology and clinical neuropsychology.  From 1991 to 2011, Dr. Denney was employed as a staff psychologist at the United States Medical Center for Federal Prisoners.  He has participated in at least nine federal capital cases in which *Atkins* issues have arisen:  *United States v. Naeem Williams, United States v. Ronell Wilson, United States v. James Ninete Leon Guerrero, United States v. Steven Northington, United States v. James Watts, United States v. Ulysses Jones, Jr., United States v. Farad Roland, United States v. Bruce Webster* and *United States v. John Johnson.*  It should be pointed out that, after some level of review by Dr. Denney, the Government did not pursue a capital prosecution, or even an *Atkins* hearing, in a number of cases.  Dr. Denney has been retained by the defense in a number of cases, including cases involving evaluations for ID such as *United States v. Markelle Seth,* (D. D.C.), 1:14-mj-00608-BAH-GMH-1.  Dr. Denney has been retained in Missouri as well by the defense.  *See Missouri v. Jamar Thomas* for claims of brain injury and ID.

2.    Dr. Joel Morgan.  Has been a licensed psychologist since 1988.
He is board certified in Clinical Neuropsychology and Pediatric
Neuropsychology.  He has participated in at least two federal
capital cases in which *Atkins* issues have arisen:  *United States
v. Farad Roland* and *United States v. Shannon Shields*.  Dr.
Morgan began full time private practice after working as a V.A.
staff neuropsychologist.  Approximately half of his practice
involves clinical diagnoses such as may be necessary to make
recommendations for schooling or for further treatment.  The
other half of his practice is forensic.  Early in his career, Dr.
Morgan interned for one year as a school psychologist.  Dr.
Morgan has published extensively and is active in professional
organizations.  He serves as an oral examiner for the American
Board of Clinical Neuropsychology and as an accreditation site
examiner for the American Psychological Association.  This
latter role involves visiting educational institutions to assess
compliance with that organization's standards for academic
accreditation.

3.    Dr. Geoffrey Karl Aguirre.
Associate Professor of Neurology at the University of
Pennsylvania. His area of clinical specialty is Behavioral
Neurology which encompasses disorders of higher-level
cognitive function including language, memory, and visuo-
spatial function.  He is the Associate Director of the
Center for Neuroscience and Society and a Senior Consultant to
the MacArthur Foundation Research Network on Law and
Neuroscience, with a focus upon the use and misuse of brain
imaging data.

## Conclusion

For the aforementioned reasons, the Government believes that WILSON

cannot meet his burden of proof to prove that he is an individual suffering from

intellectual disability pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002); *Hall v.*

*Florida*, 134 S.Ct. 1986 (2014); *Brumfield v. Cain*, 135 S.Ct. 2269 (2015); and

*Moore v. Texas*, 137 S. Ct. 1039 (2017).

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

By      *s/James Peterson*
        James Peterson
        Bar ID: VA 35373
        Trial Attorney
        Capital Case Section
        Criminal Division
        United States Department of Justice
        1331 F Street, N.W.
        6th Floor
        Washington, DC 20530
        James.D.Peterson@usdoj.gov
        Phone: (202) 353-0796
        Fax (202) 353-9779

        LOUIS CRISOSTOMO
        ROBERT MORAN
        ANDREW PICEK
        Assistant United States Attorneys
        211 W. Fort Street, Suite 2001
        Detroit, MI 48226
        (313) 226-9100

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of June 2019, a true and correct copy of the foregoing document was filed with the Court using the Court's CM/ECF systems and was served upon each attorney of record via ECF notification.

_/s/ James D. Peterson_
James D. Peterson
Trial Attorney